## UNITED STATES v. KELLOGG.
### Civ. A. 3339.

United States District Court
W. D. Louisiana, Monroe Division.
Dec. 21, 1951.

Arnold Teks, Chief, William Paul Miller, Trial Atty., Atlanta, Ga., for plaintiff.

Theus, Grisham, Davis & Leigh and Thomas W. Leigh, all of Monroe, La., for defendant.

DAWKINS, Chief Justice.

This is an action for treble damages and for an injunction under the Rent Control Act, 50 U.S.C.A.Appendix, §§ 1881–1902.

Defendant made specific answer to each of the ten numbered paragraphs of the complaint. There was filed simultaneously with the answer on August 4, 1951, a motion to dismiss for want of jurisdiction, and the tenant was impleaded for the purpose of having the lease terminated. Defendant also prayed for trial by jury.

Inasmuch as the motion to dismiss and the answer raise substantially the same issues, other than the right to trial by jury, the facts will be reviewed and then the questions of law decided. The property in question is a large, two-story, old-style residence, consisting of 10 rooms, built some forty years ago, at a time when that section of Monroe was considered an elite residential area. Since then, the city of Monroe has grown from ·a town of a little over 6000 inhabitants, according to

the census of 1900, to a city of more than 40,000. Some years prior to the Second World War, a new traffic bridge was built across the Ouachita River, 62½ feet north of this property, and a four-lane, paved highway was constructed therefrom in an easterly direction through the city. After the completion of the bridge, the street was paved, and even during the depression, business establishments began to rise along its course, until today it is rapidly becoming one of the most important business streets in the city, with consequent substantial increases in property values.

From the time of its erection, the house involved here was occupied by the late R. C. Sparks, Sr., and his family until his death many years ago, and thereafter, until the passing of his widow, as a home. There were three children, two sons and a daughter. The older son, R. C. Sparks, Jr., married several years prior to the death of his mother and established a home of his own. The younger son was married some years ago and likewise established his own home. When the mother died, the home was occupied by the daughter, her husband, Ben R. Downing, and their children. The two brothers expressed their willingness that this occupancy by the sister and her family should continue until such time as the property could be disposed of, without charge. However, the brother-in-law insisted that some amount be paid, in view of the two-thirds interest in the ownership by the brothers, and for this purpose it was finally agreed that the sum of $50 per month, sufficient to cover taxes, insurance, repairs, etc., would be contributed. It was fully recognized by the heirs and joint owners that this sum was entirely insufficient to cover the fair rental value of the property, and was to be in the nature of a token recognition of the common interest of all three heirs. In this situation, when the Rent Control Law became effective in the early stages of the Second World War, Mr. Downing, without consulting anyone else, registered the property with the Rent Control Office.

The residence or building in question occupied the west end of the lot fronting 62½ feet on Riverfront Street, along the east bank of the Ouachita River, with a depth of 300 feet back to Walnut Street on the east. On the eastern end of the lot was a four-room cottage which had been rented to outsiders for many years prior to Rent Control, and it had been regularly registered and placed under the Rent Control Law, when it became effective, which was made known to defendant when he purchased.

Just north and adjoining the property involved here, there was another lot of the same dimensions with a residence of substantially the same size and construction thereon, which had been built about the same time by the late Sig Haas and occupied by him with his family until his two sons and only children were married and established their homes elsewhere, and the occupancy continued until the death of his wife. Thereafter, the older son occupied the old home in which his father was living until his death, up to the time the property was sold to the present defendant in 1946 for the sum of $37,000. At the time of this first purchase, the defendant, appreciating the possibilities of the two properties for commercial purposes, had decided to acquire them for the benefit of his two minor children, a son and a daughter. This was done, first, as to the Haas property, but at the acquisition of the Sparks residence in 1950, the son had died and the whole was placed in the name of the surviving daughter. The two properties were purchased by defendant through the same real estate broker. The Haas property had a front on Louisville Avenue of some 300 feet and therefore was more valuable than the Sparks lot. There is no question but that since its acquisition it has been devoted exclusively to commercial purposes. Defendant paid for the second lot, with improvements thereon, the sum of $22,000, or some $15,000 less than the Haas lot, because of the latter's more advantageous location on Louisville Avenue. The evidence was undisputed that in acquiring all of the property, it was defendant's intention to devote it strictly to commercial purposes, and this was expressly stipulated in both leases, including the one under which the tenant here took possession. At the

time of the purchase of this last lot, defendant did not know that Downing had registered the building with the Rent Control Office, although he was informed, as stated, that the small cottage on the eastern end was so registered, and, after getting possession, it was torn down and the space made available for commercial uses.

The real estate broker who handled the purchase of both properties for the defendant, knew that the latter, until other arrangements could be made, as circumstances permitted, wanted to get as much revenue out of the property as possible, and notwithstanding he was aware the defendant intended to confine its use to commercial purposes, he advertized the Sparks house for rent, and in doing so, stated that it was readily adaptable for apartments, at a time when the city of Monroe was still under rent control, which would require the tenant, if used for housing accommodations, to register them with the Rent Control Office. However, when the lease was finally executed, it clearly provided that the property should be used only for commercial purposes, and the lessee attempted to find tenants who would use it for business purposes, such as doctor's offices, etc., but being unsuccessful, the rooms were rented as apartments. When this came to the attention of the Rent Control Office, the defendant and his lessee were called before those in charge, and the former was notified that he was exceeding the amount of $50 per month stated in the registration by Downing under the circumstances disclosed earlier herein, and that it was necessary for him to make application for an increase that would be considered and such action taken as might be justified by the facts. (The lease also contained a provision which empowered defendant to cancel it if the property were used for other than commercial purposes, but this was never done.) Defendant declined to make the application on the advice of his present counsel, for the reason the property would thereby be committed to rent control, and he wished to use all of it for commercial purposes. At that time, the rent of $100 per month had been fixed under the lease in question here, or twice the sum which was fixed in the registration by Downing, and defendant continued to collect that sum for the first six months of the lease, which began on September 28, 1950 and was for a term of one year. At the end of the first six months, the tenant, at the suggestion of the Rent Control Office, stopped payment of any further rent.

This suit was filed on June 14, 1951, for treble the alleged excess as for a period of ten months at $50 per month, or a total of $1500, although the tenant had paid the stipulated rent of $100 per month for only six months, and the excess could not have been more than $300. Neither was anything paid during the four months immediately preceding June 30, 1951, which was part of the ten months alleged and sued for. At the trial in October, 1951, it also appeared that the tenant had continued to occupy the premises without paying anything for the period between June 30 and October. In the meantime, the city of Monroe, under authority of the Rent Control Law, discontinued such control.

There are two pertinent questions of law involved in this case. The first is, did the arrangement reached between the heirs or co-owners of the property bring it within the meaning of the first Rent Control Act, Title 50 U.S.C.A.Appendix, § 1822 et seq., which required its registration for that purpose, so that when acquired by defendant, it would pass subject to such control when leased by him to the tenant in this case? The second question is whether, having leased the building under express stipulations that it should be used exclusively for commercial purposes, could the tenant unilaterally by using it for housing accommodations without the owner's consent, create a situation that would legally relate back to the making of the lease so as to convert it into one for housing accommodations against the owner's will?

Of course, if there were collusion between the landlord and tenant in which a form of commercial lease was used to cover up a transaction in which the parties in reality intended that the premises would be used for housing accommodations, this would not change the nature of the real agreement. There is no evidence to sup-

port any such conclusion, but simply inferences sought to be drawn from the advertisement of the premises for rent by the broker, and the further inference that this advertisement was seen and in effect approved by the owner, and not promptly repudiated by him; and by the further fact that the latter did nothing to cancel the lease under the permissible clause, if the property were used for other than commercial purposes.

The purpose of the original Rent Control Act was to protect, as a war measure, the public generally, and particularly workers in industrial plants or other activities devoted to the war, the armed forces and all necessary auxiliary situations, from gouging by unscrupulous owners who did not have the patriotism or interest in their country and its survival to refrain from such practices. The act had many glaring faults and discriminations, but this was due largely to the necessity for prompt action at a time of grave danger, the responsibility for which, as is true in our present predicament, will have to be left to historians, when, as it is hoped, we may sometime in the future recover from the errors and poor judgment of our leadership over the past twenty years. To be made workable, it had to apply to the whole of any given rent defense area, whether occupied by persons engaged in war activities or not. Yet, it was obviously not contemplated that the law or regulations made pursuant thereto should apply or prevent the members of a family confronted with the circumstances which existed in this case, from making arrangements for the care and handling of their property by one or more of their members.

Section 1892 of the Housing and Rent Act of 1947 declares: "(b) The term 'housing accommodations' means any building, structure, or part thereof, or land appurtenant thereto, or any other real or personal property rented or offered for rent for living or dwelling purposes (including houses, apartments, rooming- or boarding-house accommodations, and other properties used for living or dwelling purposes) together with all privileges, services, furnishings, furniture, and facilities connected with the use or occupancy of such property." Laws, such as rent control by the Government, are authorized and sustainable only under the war powers of Congress, which has no general police power, and must be strictly construed in their application to situations not clearly falling thereunder. Prince v. Davis, 1949, 195 Misc. 901, 87 N. Y.S.2d 600. Can it be said that what the co-owners of a home like that involved here do as between themselves with respect to the occupancy thereof by one or more members of the family where the property has never been "rented or offered for rent for living or dwelling purposes" the definition in Section 1892 of the Housing and Rent Act can have any effect either favorable or unfavorable upon the accomplishment of the purposes of the law? This property was never rented or offered for rent to anyone outside of the Sparks family until its ownership had been parted with to the present defendant, and to say that an agreement by the heirs or co-owners for its care and upkeep by one of them, pending its sale, from which the proceeds could be divided, is to fly in the face of what was evidently the conception of Congress with respect to such a relationship or situation, as expressed in the Act of 1947 itself. In this Section 1892, defining "persons" and "housing accommodations" and otherwise declaring conditions in which it would apply, as well as those which were excluded in subsection (c), it was declared "that it does not include * * * (B) the construction of which (rental housing accommodations) was completed on or after February 1, 1945, and prior to February 1, 1947, and which between the date of completion and June 30, 1947, both dates inclusive, at no time were rented (*other than to members of the immediate family of the landlord*) as housing accommodations".) (Emphasis by the writer.)

This would indicate that the Act did not intend that rental of newly constructed housing accommodations within the stated period to a member of the immediate family should subject it to rent control. The same intention is again shown, it is believed, by subsection (4) of Paragraph (c) of Section 1892, reading as follows: "(4) nonhousekeeping, furnished housing accommoda-

748

tions, located within a single dwelling unit not used as a rooming or boarding house, but only if (A) no more than two paying tenants, *not members of the landlord's immediate family,* live in such dwelling unit, and (B) the remaining portion of such dwelling unit is *occupied by the landlord or his immediate family."* (Emphasis by the writer.)

In order for the house involved here to have been subjected to rent control at the rates fixed by Downing, the registration had to be legal. It could not be done merely by the registration if it was not required under the law itself, regardless of what Downing believed, and may be disregarded.

In view of the conclusions thus reached, it becomes unnecessary to pronounce a legal view as to the consequences flowing from what the broker included in the advertisement, or the tenant in renting apartments did, or the refusal of defendant to apply for authority to increase the rent, for the simple reason that the law did not cover this property.

On the other hand, defendant is entitled to have the lease annulled, as prayed for in the third party proceedings.